UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| NORTHERN VALLEY COMMUNICATIONS, LLC, | ) ) ) | CIV. 11-4053-KES |
| Plaintiff, | ) ) | |
| vs. | ) ) | MEMORANDUM OPINION AND ORDER |
| SPRINT COMMUNICATIONS CO., L.P., | ) ) | |
| Defendant. | ) ) ) | |

Plaintiff, Northern Valley Communications, LLC, moves for summary judgment, Docket 23, which defendant, Sprint Communications Co., L.P., opposes. This case is one of numerous similar cases pending in the District of South Dakota. This court has stayed the majority of these cases and referred specific issues to the Federal Communications Commission (FCC) pursuant to the primary jurisdiction doctrine. Although neither of the parties in the present case have moved the court to stay the action and refer specific issues to the FCC, the court ordered the parties to address whether this case should be stayed and referred to the FCC. Docket 56.

Northern Valley argues that the court should not refer this case because the FCC has deemed Northern Valley's tariff at issue in this case lawful and the court can apply the plain meaning of the tariff to the time period at issue. Sprint asserts that the court should stay this case and refer issues to the FCC.

The court finds that referral of certain issues to the FCC is called for under the primary jurisdiction doctrine. Northern Valley's motion for summary judgment is denied without prejudice.

**BACKGROUND**

**I.    History of the Present Case**

Sprint provides nationwide long-distance telephone services and is known under the telecommunications regulatory framework as an interexchange carrier (IXC). Sprint delivers long-distance calls to a local exchange carrier (LEC) or a competitive local exchange carrier (CLEC) for termination to end users. Under the FCC's current regulatory framework, Sprint pays the LEC a terminating access charge based on the LEC's interstate access tariff, which is filed with the FCC.

Northern Valley is a CLEC. Northern Valley filed its tariff number two with the FCC on November 15, 2004, which became effective on November 16, 2004. Pursuant to tariff number two, Northern Valley billed Sprint for access charges when Sprint's long-distance customers originated calls to several companies that provide free telephone services such as conference calling, chat-line, and similar services,[1] which used Northern Valley's network. Northern Valley charged Sprint its typical rural access charge for the free conference calls. Sprint has refused to pay these charges since September 1,

---

[1] The court will refer to these companies collectively as "free calling providers" or "conference calling companies."

2007. Sprint's refusal to pay access charges billed pursuant to Northern Valley's interstate access tariff number one and tariff number two is the subject of a separate case pending in this court. *Northern Valley Commc'ns, LLC v. Sprint Commc'ns Co.*, 08-cv-1003-KES (*Sprint I*).

On July 8, 2010, Northern Valley filed tariff number three with the FCC, which became effective and received deemed lawful protection on July 23, 2010. On June 7, 2011, the FCC found in favor of Qwest Communications Company on its formal complaint that was filed against Northern Valley's tariff number three. *Qwest Commc'ns Co., LLC v. Northern Valley Commc'ns, LLC*, 26 FCC Rcd. 8332 (June 7, 2011), 2011 WL 2258081 (*Qwest v. Northern Valley I*). In *Qwest v. Northern Valley I*, the FCC found Northern Valley's definition of "end user" and "customer of a foreign or interstate telecommunications service" to be unlawful and directed Northern Valley to revise the tariff. 26 FCC Rcd. at 8332-33. The FCC reasoned that Northern Valley's definition of "end user" was unlawful because an end user must receive services from Northern Valley "for a fee." *Id.* at 9337 ("[U]nder the Commission's ILEC (incumbent LEC) access charge regime, an 'end user' is a customer of a service that is offered for a fee.").

Sprint also filed a formal complaint regarding Northern Valley's tariff number three, which the FCC granted in part and denied in part on July 18, 2011. *Sprint Commc'ns Co., LP v. Northern Valley Commc'ns, LLC*, 26 FCC Rcd.

10780 (July 18, 2011), 2011 WL 2838100 (*Sprint v. Northern Valley I*). In *Sprint v. Northern Valley I*, the FCC found certain provisions of Northern Valley's tariff to be unlawful and directed Northern Valley to revise the tariff. 26 FCC Rcd. at 10780-81.

On July 26, 2011, Northern Valley filed changes to effectuate the modifications mandated by the FCC *in Sprint v. Northern Valley I.*  Qwest and Sprint filed their petitions to suspend or reject the tariff on August 2, 2011. The FCC rejected Qwest's and Sprint's petitions, and Northern Valley's tariff number three as revised was deemed lawful and effective on August 10, 2011. *Protested Tariff Transmittal Action Taken*, 26 FCC Rcd. 11282, 11282 (Aug. 12, 2011), 2011 WL 3561907 ("[W]e conclude that the parties filing petitions against the tariff transmittals listed in this Report have not presented compelling arguments that these transmittals are so patently unlawful as to require rejection.").[2]

Northern Valley's tariff number three has a definition for Voice over Internet Protocol (VoIP) technology. *See* Docket 48-1 ("The term VoIP-PSTN Traffic shall have the meaning denoted in the Federal Communications Commission Report and Order in WC Docket Nos. 10-90, etc., F.C.C. Release

---

[2] The court will refer to Northern Valley's tariff number three and revised tariff number three as "tariff number three" unless there is a need to distinguish between the tariffs.

4

No. 11-161 (November 18, 2011). It is traffic exchanged over PSTN (Public

Switched Telephone Network) facilities that originates and/or

terminates in IP (Internet Protocol) format.").

In *Sprint I*, which is pending before this court, Northern Valley moved to

stay the action and to refer certain issues to the FCC. The court granted the

motion to stay and refer. *Sprint I*, Docket 110. At the parties' request, the court

also referred certain issues with Northern Valley's intrastate tariff to the South

Dakota Public Utilities Commission (SDPUC). *Sprint I*, Docket 112. The parties

have almost completed discovery before the SDPUC and "Northern Valley

anticipates the parties will soon approach the FCC staff to determine a

schedule for initiating Sprint's Formal Complaint to effectuate the referral in

[*Sprint I*]." Docket 58 at 8.

## II.   Related Cases

This case is one of a number of cases pending in this court and in other

courts involving a dispute between a CLEC or an LEC and an IXC regarding

access charges associated with traffic delivered to free calling providers. In

each of these cases, a CLEC claims that an IXC has wrongfully refused to pay

terminating access charges for services performed pursuant to the CLEC's

interstate tariffs and requests compensation under breach of contract, breach

of implied contract, and/or unjust enrichment theories. In each case, the IXC

claims that the services provided were not covered by the applicable tariff.

Many of the IXCs also claim that the applicable CLEC engaged in unlawful traffic pumping.

The following cases are pending in the District of South Dakota, some of which have been stayed pending referral of specific issues to the FCC:

| | |
|---|---|
| *Sprint v. Native American Telecommunications*, Civ. 10-4110-KES | Stayed |
| *Northern Valley v. Qwest*, Civ. 11-4052-KES | |
| *Northern Valley v. Sprint*, Civ. 11-4053-KES | |
| *Northern Valley Communications L.L.C. v. Qwest Communications Co.*, Civ. 09-1004-CBK | Stayed |
| *Splitrock Properties, Inc. v. Sprint Communications Co.*, Civ. 09-4075-KES | Stayed |
| *Northern Valley Communications, LLC v. Sprint Communications Co.*, Civ. 08-1003-KES | Stayed |
| *Splitrock Properties, Inc. v. Qwest Communications Corp.*, No. 08-4172-KES | Stayed |
| *Sancom, Inc. v. AT & T Corp.*, Civ. 08-4211-KES | Stayed |
| *Northern Valley Communications, LLC v. MCI Communications Services, Inc. d/b/a Verizon Business Services*, Civ. 07-1016-KES[3] | Stayed |
| *Sancom, Inc. v. Sprint Communications Co.*, Civ. 07-4107-KES | Stayed |
| *Sancom, Inc. v. Qwest Communications Co.*, Civ. 07-4147-KES. | Stayed |

---

[3] *Northern Valley v. MCI*, Civ. 07-1016 is consolidated with *Sancom, Inc. v. MCI Communications Services, Inc., d/b/a Verizon Business Services*, Civ. 07-4106.

Moreover, the court is aware of similar cases pending in other jurisdictions, many of which have been stayed pending referral of specific issues to the FCC. *See, e.g.*, *Qwest Commc'ns Co. v. Tekstar Commc'ns, Inc.*, No. 10-490, 2010 WL 2772442 (D. Minn. July 12, 2010); *All. Am. Tel. Co. v. AT&T, Inc.*, No. 07-861, 2010 WL 7526933 (S.D.N.Y. Jan. 19, 2010); *Tekstar Commc'ns, Inc. v. Sprint Commc'ns Co.*, No. 08-1130, 2009 WL 2155930 (D. Minn. July 14, 2009). *See also Bluegrass Tel. Co. v. Qwest Commc'ns Co.*, No. 4:09-CV-70-M, 2010 WL 1257727 (W.D. Ky. Mar. 26, 2010) (staying the case pending resolution of referrals in District of South Dakota, District of Minnesota, and Southern District of New York cases). *But see N. Cnty. Commc'ns Corp. v. Verizon Global Networks, Inc.*, 685 F. Supp. 2d 1112, 1117 (S.D. Cal. 2010) (denying motion to refer Verizon's counterclaims pursuant to primary jurisdiction doctrine).

## III.    Relevant FCC History

The FCC not only has multiple similar actions pending before it (in addition to the FCC history related to Northern Valley listed above), but also has taken various administrative actions concerning the services and technology at issue in this case. The *Farmers* line of cases is particularly pertinent to this action. *See also Sancom, Inc. v. AT&T Corp.*, 696 F. Supp. 2d 1030, 1034-35 (D.S.D. 2010) (discussing the *Farmers* line of cases in detail).

In *Farmers*, Farmers & Mutual Telephone Co., an LEC, and Qwest Communications Corp., an IXC, disputed whether Qwest had to pay Farmers'

7

billed access charges for types of services similar to those at issue here. *Qwest Commc'ns Corp. v. Farmers & Merchants Mut. Tel. Co.*, 22 FCC Rcd. 17973 (2007), 2007 WL 2872754 (*Farmers I*). Initially, the FCC, in addressing whether a free conference calling company is an end user for purposes of Farmers' tariff and, if not, whether Farmers can recover access charges from Qwest, ruled in favor of Farmers. *Id.* at 17986-88. The FCC later granted partial reconsideration based on Qwest's assertions that Farmers engaged in fraud and misrepresentations. *Qwest Commc'ns Corp. v. Farmers & Merchants Mut. Tel. Co.*, 23 FCC Rcd. 1615 (2008), 2008 WL 246393.

In *Qwest Communications Corporation v. Farmers & Merchants Mutual Telephone Company*, 24 FCC Rcd. 14801, 14812-13 (2009), 2009 WL 4073944 (*Farmers II*), the FCC found that the conference calling companies did not subscribe to the services offered under Farmers' tariff. Because the conference calling companies were neither "customers" nor "end users" within the meaning of Farmers' tariff, Farmers was not entitled to charge Qwest switched access charges. *Id.* Thus, the FCC found that Farmers' practice of charging Qwest access charges for the traffic from the conference calling companies was unjust and unreasonable in violation of 47 U.S.C. § 201(b). *Id.* at 14812-13. The FCC, however, declined to rule that Farmers was "precluded from receiving any compensation at all for the services it has provided to Qwest." *Id.* at 14812 n.96 (citation omitted). The FCC declined Farmers' petition for reconsideration and rejected challenges to its authority to issue *Farmers II. Qwest Commc'ns*

8

*Corp. v. Farmers & Merchants Mut. Tel. Co.*, 25 FCC Rcd. 3422 (2010), 2010 WL 972315 (*Farmers III*).

The Court of Appeals for the District of Columbia upheld the FCC's reasoning in *Farmers II* and *Farmers III. Farmers & Merchants Mut. Tel. Co. v. Fed. Commc'n Comm'n*, 668 F.3d 714 (D.C. Cir. 2011). In summarizing the FCC's decision in *Farmers II*, the court reasoned that "[t]he Commission found that in numerous respects, the conference calling contracts did not establish a subscriber relationship under Farmers' tariff." *Id.* at 720 (internal quotation omitted). For example, Farmers did not bill the conference calling companies and the companies never paid access charges to Farmers, Farmers did not expect to be paid, and the parties' relationship was not structured in a manner consistent with Farmers' tariff. *Id.* The court also rejected Farmers' argument that the FCC ignored the plain terms of its tariff that required Qwest to pay the tariffed rate regardless of whether the conference calling companies were end users. *Id.* (reasoning that "the tariff itself includes a diagram of switched access service that illustrates an end user as one of the sub-elements of that service.").

The court upheld the FCC's determination that Farmers did not provide Qwest with "switched access" pursuant to its tariff, and, therefore, Farmers was unjustly and unreasonably charging Qwest pursuant to § 201(b) and

§ 203(c). *Id.* at 721 (citation omitted). Thus, the court upheld the FCC's determination that the filed rate doctrine did not apply:

> Although it did not decide how traffic to the conference calling companies should be classified, the Commission based its conclusion, that in the absence of an end user such traffic did not constitute switched access service under the tariff, on the controlling plain text of Farmers' tariff. The service was outside of the tariff and, as such, the filed rate doctrine could not protect Farmers from liability to Qwest.

*Id.* at 722-23 (internal citation omitted). The court continued to leave open the question of whether and to what extent Farmers could recover compensation from Qwest.

On February 9, 2011, the FCC released a "Notice of Proposed Rulemaking and Further Notice of Proposed Rulemaking." *Connect America Fund; A National Broadband Plan for Our Future; Establishing Just and Reasonable Rates for Local Exchange Carriers*, 26 FCC Rcd. 4554, 2011 WL 466775. On November 28, 2011, the FCC issued its final rule concerning the services and technology at issue in this case. *Connect America Fund; A National Broadband Plan for Our Future; Establishing Just and Reasonable Rates for Local Exchange Carriers*, 76 Fed. Reg. 73830 (Nov. 29, 2011), 2011 WL 5909863 (to be codified at 47 C.F.R. pts. 0, 1, 20, 36, 51, 54, 61, 64, and 69) (final rule). After the court ordered further briefing on what impact, if any, the final rule has on this case, both parties argued that the final rule validated

10

their positions and the court could utilize the final rule in ruling on Northern Valley's summary judgment motion. Docket 48, 52.

The final rule sets out a two-part test for determining whether an LEC or a CLEC is engaged in access stimulation and, if so, provides a compensation scheme. 76 Fed. Reg. at 73837. The FCC also created a transitional framework for VoIP intercarrier compensation. *Id.* at 73833. But the final rule does not state that it is retroactive, and the court will not assume that it is retroactive. *See, e.g., Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("Retroactivity is not favored in the law. . . . By the same principle, a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms." (citations omitted)). Thus, the final rule is inapplicable to the time period before it became effective.

## DISCUSSION

"Primary jurisdiction 'is a doctrine specifically applicable to claims properly cognizable in court that contain some issue within the special competence of an administrative agency. It requires the court to enable a referral to the agency, staying further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling.' " *United States v. Rice*, 605 F.3d 473, 475 (8th Cir. 2010) (quoting *Reiter v. Cooper*, 507 U.S. 258, 268 (1993)). "The doctrine 'is concerned with promoting proper relationships

11

between the courts and administrative agencies charged with particular regulatory duties.' " *Id.* (quoting *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63 (1956)). "Primary jurisdiction 'promotes uniformity, consistency, and the optimal use of the agency's expertise and experience.' " *Id.* (quoting *United States v. Henderson*, 416 F.3d 686, 691 (8th Cir. 2005)).

There is no fixed formula for deciding whether to apply the doctrine of primary jurisdiction. *Access Telecomms. v. Sw. Bell Tel. Co.*, 137 F.3d 605, 608 (8th Cir. 1998) (citing *W. Pac.*, 352 U.S. at 64). Instead, the court considers "whether the reasons for the doctrine are present and whether applying the doctrine will aid the purposes for which the doctrine was created." *Id.* (citing *United States v. McDonnell Douglas Corp.*, 751 F.2d 220, 224 (8th Cir. 1984)). The Eighth Circuit has identified two main reasons and purposes for the doctrine. *Alpharma, Inc. v. Pennfield Oil Co.*, 411 F.3d 934, 938 (8th Cir. 2005) (internal quotation omitted). First, and most common, "the use of agency expertise in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion[.]" *Id.* (internal quotation omitted). Second, the "promotion of consistency and uniformity within the areas of regulation[.]" *Id.* (citation omitted); *see also Rice*, 605 F.3d at 475 ("Primary jurisdiction 'promotes uniformity, consistency, and the optimal use of the agency's expertise and experience.' " (quoting *Henderson*, 416 F.3d at 691)). "The doctrine of primary jurisdiction . . . should seldom be

12

invoked unless a factual question requires both expert considerations and uniformity of resolution." *McDonnell Douglas*, 751 F.2d at 224 (quotations omitted). When the primary jurisdiction doctrine applies, the "district court has discretion either to [stay the case and] retain jurisdiction or, if the parties would not be unfairly disadvantaged, to dismiss the case without prejudice." *Access Telecomms.*, 137 F.3d at 609 (internal quotation and citation omitted, alteration in original).

The primary jurisdiction doctrine should be applied when the reasons for the doctrine are present even if the parties have not raised the issue. This is because "the doctrine exists for the proper distribution of power between judicial and administrative bodies and not for the convenience of the parties." *Red Lake Band of Chippewa Indians v. Barlow*, 846 F.2d 474, 476 (8th Cir. 1988).

In prior orders, this court has generally referred three issues to the FCC: (1) whether the CLEC or LEC is entitled to collect interstate switched access charges it has billed to the IXC for calls to numbers assigned to free calling providers; (2) in the event the services provided by the CLEC or LEC to the IXC do not qualify as switched access service under the CLEC's or LEC's applicable interstate access tariff, determination of the proper classification of these services, whether such services are subject to federal tariffing requirements, and whether the CLEC or LEC is entitled to obtain compensation for these

services; and (3) in the event that the services provided by the CLEC or LEC to the IXC do not qualify as switched access service under the CLEC's or LEC's applicable interstate access tariff, but the CLEC or LEC is otherwise entitled to compensation for these services, determination of a reasonable rate for these services. *See, e.g.*, *Sancom*, 696 F. Supp. 2d at 1036.[4]

Sprint agrees that referral is appropriate and requests that the court refer two issues in addition to the three issues that the court has previously referred to the FCC in other cases. Northern Valley argues that referral is inappropriate. The court finds that the reasons for applying the primary jurisdiction doctrine are present and that applying the doctrine will aid the purposes for which the doctrine was created with respect to the three issues outlined by the court and the two issues identified by Sprint.

## I.   Application of Tariffs

The first issue the court considers referring to the FCC is the question of whether the services that Northern Valley provides with respect to the free

---

[4] The court has issued a number of almost-identical orders staying similar cases pending referral to the FCC. *See, e.g.*, *Sprint Commc'ns Co. v. Native Am. Telecom, LLC, No. 10-4110-KES, 2012 wl 591674 (D.S.D. Feb. 22, 2012); Splitrock Props., Inc. v. Sprint Commc'ns Co.*, No. Civ. 09-4075-KES, 2010 WL 1329634 (D.S.D. Mar. 30, 2010); *Splitrock Props., Inc. v. Qwest Commc'ns Corp.*, No. Civ. 08-4172-KES, 2010 WL 2867126 (D.S.D. July 20, 2010); *Sancom, Inc. v. AT&T Corp.*, 696 F. Supp. 2d 1030 (D.S.D. 2010); *Sancom Inc. v. Sprint Commc'ns Co.*, No. Civ. 07-4107-KES, 2010 WL 936718 (D.S.D. Mar. 15, 2010); *Sancom, Inc. v. Qwest Commc'ns Corp.*, No. Civ. 07-4147, 2010 WL 960005 (D.S.D. Mar. 12, 2010). For simplicity, the court will refer to its previous orders with a single citation to *Sancom, Inc. v. AT&T Corp.*, 696 F. Supp. 2d 1030 (D.S.D. 2010).

calling provider traffic qualifies as "switched access service" within the meaning of Northern Valley's tariff number three. This is essentially a tariff interpretation and enforcement question.

An action to enforce a tariff is properly brought before a district court. *Access Telecomms.*, 137 F.3d at 609; *see also United States v. Great N. Ry. Co.*, 337 F.2d 243, 246 (8th Cir. 1964) ("Ordinarily, the construction of a tariff is a matter of law for the Court, being no different than the construction of any other written document." (citation omitted)). But " 'where words in a tariff are used in a peculiar or technical sense, and where extrinsic evidence is necessary to determine their meaning or proper application,' . . . the issue should first go to the appropriate administrative agency." *Access Telecomms.*, 137 F.3d at 609 (quoting *W. Pac.*, 352 U.S. at 66). "The reason is plainly set forth: such a 'determination is reached ordinarily upon voluminous and conflicting evidence, for the adequate appreciation of which acquaintance with many intricate facts of [the regulated area] is indispensable, and such acquaintance is commonly to be found only in a body of experts.' " *W. Pac.*, 352 U.S. at 66 (quoting *Great N. Ry. Co. v. Merchants' Elevator Co.*, 259 U.S. 285, 291 (1922)).

If the interpretation of the tariff is straightforward, then courts do not apply the primary jurisdiction doctrine. *See, e.g.*, *GCB Commc'ns, Inc. v. U.S. S. Commc'ns, Inc.*, 650 F.3d 1257, 1264 (9th Cir. 2011) (reasoning that referral was not appropriate because "the basic compensation concept, with all of its

15

complexity, is not before us. What is before us is the relatively easier task of construing the language of the FCC orders."); *Nat'l Commc'ns Ass'n v. AT&T Co.*, 46 F.3d 220, 223 (2d Cir. 1995) (reasoning that application of the primary jurisdiction doctrine was unnecessary because the case did "not present any issues involving intricate interpretations or applications of tariffs that might need the FCC's technical or policy expertise.").

Contrastingly, if the case requires interpretation of technical terms or specialized knowledge, then referral is appropriate under the primary jurisdiction doctrine. *See, e.g.*, *Access Telecomms.*, 137 F.3d at 609 (reasoning that referral was appropriate because the issue required the FCC to determine the reasonableness of a telecommunications practice); *Clark v. Time Warner Cable*, 523 F.3d 1110, 1115 (9th Cir. 2008) (reasoning that referral was proper because Congress specifically delegated responsibility to the FCC to define the type of services that were at issue in that case); *Davel Commc'ns, Inc. v. Qwest Corp.*, 460 F.3d 1075, 1089 (9th Cir. 2006) (reasoning that "the interpretation of an agency order issued pursuant to the agency's congressionally granted regulatory authority falls within the agency's primary jurisdiction where the order reflects policy concerns or issues requiring uniform resolution." (citing *Serv. Storage & Transfer Co. v. Virginia*, 359 U.S. 171, 177 (1959); *Rilling v. Burlington N. R.R. Co.*, 909 F.2d 399, 401 (9th Cir. 1990)). *See In re StarNet, Inc.*, 355 F.3d 634, 639 (7th Cir. 2004) ("Instead of trying to divine how the

16

FCC would resolve the ambiguity . . . we think it best to send this matter to the Commission under the doctrine of primary jurisdiction.").

The application of Northern Valley's tariff number three to the time period before the final rule became effective requires the interpretation of words used in a technical sense and consideration of extrinsic evidence relating to topics within the FCC's expertise. Tariff number three defines an access service as one limited to traffic that terminates with end users. *See* Docket 48-1 at 7 ("VoIP-PSTN Traffic is defined as traffic exchanged between a Company End User and the Buyer in Time Division Multiplexing (TDM) format that originates and/or terminates in Internet Protocol (IP) format."). Under Northern Valley's tariff number three, "end user"

> means any Customer of an Interstate or Foreign Telecommunications Service that is not a carrier, except that a carrier other than a telephone company shall be deemed to be an "End User" when such carrier uses a Telecommunications service for administrative purposes and a person or entity that offers Telecommunications services exclusively as a reseller shall be deemed to be an "End User" if all resale transmissions offered by such reseller originate on the premises of such reseller. An End User must pay a fee to the Company for telecommunications service. Other carriers, including IXCs, are not considered to be End Users under the terms of this Tariff, unless the Company consents to such classification in writing.

Docket 28-6 at 10. The revised tariff appears not to have changed the definition of end user, but it does contain a new definition for "volume end user": "An End User that obtains Service from the Company in order to provide high traffic services, including, but not limited to, chat line services, conference

17

calling services, help desk assistance, or call center support, designates the Company's central office as its EDP, and accordingly, installs equipment in the Company's central office." Docket 48-1 at 5.

One of the most glaring areas in need of the FCC's expertise is Northern Valley's definition of "end user" and "volume end user" in its tariffs. The FCC has, in various orders, interpreted "end user" in different CLECs' tariffs, including Northern Valley's tariff number two in *Qwest v. Northern Valley I. See* 26 FCC Rcd. at 8335. As in *Qwest v. Northern Valley I*, the FCC will need to carefully parse the terms used in Northern Valley's tariff number three to determine whether the tariff applies to calls to free conference calling companies. The interpretation of "volume end user" and "end user" is a task within the FCC's unique expertise. *See, e.g.*, *AT&T Corp. v. Y'Max Commc'ns Corp.*, 226 FCC Rcd. 5742, 5747-48 (2011), 2011 WL 1361436 (interpreting "end user" when the LEC billed the IXC access charges for calls made through a MagicJack device that allows a person to make a phone call over the internet); *Sancom*, 696 F. Supp. 2d at 1038 ("The FCC is uniquely qualified to compare the terms of an agreement between an LEC and a conference calling company with the terms of a traditional agreement for the provision of tariffed access services because of the FCC's experience in the field.").

Northern Valley argues that because its revised tariff number three has "deemed lawful" status, the court can rule on its pending summary judgment

18

motion by interpreting the plain meaning of the tariff. But Northern Valley cites to no FCC precedent, and the court has found no precedent, enforcing all the terms of a CLEC's interstate access tariff for calls made to free conference calling services. Instead, throughout various orders and the final rule, the FCC has announced piecemeal rules and definitions for these types of tariffs. Creating a uniform system of rules regarding the type of cases is within the FCC's expertise, not the court's expertise.

Moreover, Northern Valley's tariff number three has a definition for VoIP technology. It is unclear how, if at all, a CLEC is to be compensated when it utilizes VoIP technology. Some courts have held that VoIP services are exempt from access charges under the Federal Communications Act (FCA), 47 U.S.C. §§ 251(b)(5), 251(g). *See, e.g.*, *PAETEC Commc'ns, Inc. v. CommPartners, LLC*, No. 08-0397, 2010 WL 1767193, at *5 (D.D.C. Feb. 18, 2010) ("There cannot be a pre-Act obligation relating to inter-carrier compensation for VoIP, because VoIP was not developed until the 1996 [Federal Communications] Act was passed. . . . Because the access charge regime is inapplicable to VoIP-originated tariff, and because a filed tariff cannot be inconsistent with the statutory framework pursuant to which it is promulgated, the filed-rate doctrine must yield in this case."); *cf. Sw. Bell Tel., L.P. v. Mo. Pub. Serv. Comm'n*, 461 F. Supp. 2d 1055, 1080 (E.D. Mo. 2006) ("Because IP-PSTN is a

19

new service developed after the Act, there is no pre-Act compensation regime which could have governed it, and therefore § 251(g) is inapplicable.").

In determining whether a CLEC can recover switched access charges from an IXC when the CLEC uses a non-traditional method of service, the FCC has carefully reviewed the CLEC's tariffs and the technology at issue to reach a resolution. *See, e.g., AT&T Corp.*, 26 FCC Rcd. at 5752-55 (carefully parsing the LEC's interstate tariff to determine how the LEC should be compensated, if at all, when it used a MagicJack device to transmit calls). Determining whether or to what extent Northern Valley utilizes VoIP technology in providing its tariffed services, determining whether tariffed services using VoIP technology are the functional equivalent of services provided by incumbent LECs, and determining how Northern Valley should be compensated, if at all, for using VoIP technology, requires detailed knowledge of the types of technology at issue and how that technology fits into the FCA. These are all tasks within the FCC's expertise.

Determining how, if at all, Northern Valley should be compensated will likely require a determination of what rate applies to access charges incurred with VoIP technology, which is solely within the FCC's expertise. *See MCI Telecomms. Corp. v. F.C.C.*, 627 F.2d 322, 334-36 (D.C. Cir. 1980) (discussing how the FCC, not the court, has the ability to determine rates for interstate telecommunications issues). Thus, the court will refer to the FCC an issue

20

concerning the application of Northern Valley's tariff numbers.[5] Whether, under the facts of the present dispute between Northern Valley and Sprint, Northern Valley is entitled to collect interstate switched access charges that it has billed to Sprint, including services that may utilize VoIP technology, pursuant to Northern Valley's interstate access tariff number three or revised interstate access tariff number three for calls to numbers assigned to free calling providers.

As noted by various courts, "[t]his area of telecommunication regulation is in dynamic flux . . . [so] these issues . . . are ripe for determination and clarification by the regulatory agency." *All. Am. Tel.*, 2010 WL 7526933, at *1; *see also Sancom*, 696 F. Supp. 2d at 1043 (same); *Bluegrass Tel.*, 2010 WL 1257727, at *2 (same); *see also Allnet Commc'n Serv., Inc. v. Nat'l Exchange Carrier Ass'n*, 965 F.2d 1118, 1121 (D.C. Cir. 1992) (reasoning that the FCC is in the better position to resolve conflicting policies in the telecommunications arena). The area is even more in flux after the FCC announced its final rule but did not provide analysis on how, if at all, a CLEC should be compensated for the services at issue here for the time period before the final rule became

---

[5] This issue is similar to an issue referred to the FCC in other litigation pending before this court. *See, e.g.*, *Native American Telecom*, 2012 WL 591674 at *11 ("Whether, under the facts of the present dispute between NAT and Sprint, NAT is entitled to collect interstate switched access charges it has billed to Sprint using VoIP technology pursuant to NAT's interstate access tariff number one, interstate access tariff number two, or revised interstate tariff number two for calls to numbers assigned to free calling providers.").

effective. Because the FCC's input on the tariff application, classification of services, the use of VoIP technology, and reasonable rate issues may inform the court's analysis of this case going forward, the court will refer the following issue to the FCC:[6] If the services provided by Northern Valley do not qualify as switched access services to companies that provide free conferencing calling services, then determination of how the traffic should be classified, whether that traffic can be tariffed, and whether Northern Valley is entitled to any compensation for the services Northern Valley provided, and if so, what a reasonable rate would be for Northern Valley's services.

Moreover, because the FCC, not the court, determines the rate for telecommunication services, the FCC should determine what rate applies to services provided by Northern Valley if the services are not switched access services. Northern Valley agrees that the court could need guidance from the FCC in the event the court grants Northern Valley's summary judgment motion either in part or in whole, but it contends that the court should wait until that time. *See* Docket 58 at 15 ("Northern Valley acknowledges that the Court may

---

[6] The court has referred an almost identical issue in other cases. *See, e.g.*, *Sancom*, 696 F. Supp. 2d at 1043 ("In the event that the services provided by Sancom to AT & T, by which calls placed by AT & T's customers are delivered to free calling providers served by Sancom, do not qualify as switched access service under Sancom's applicable interstate access tariff, determination of the proper classification of these services, whether such services are subject to federal tariffing requirements, and whether Sancom is entitled to obtain compensation for these services.").

continue to need additional guidance with regard to . . . alternative recovery issues. However, the potential need for this guidance in the future does not necessitate a referral at this time.").

Before the court could even reach the possibility of awarding a remedy in this case, including any alternative recovery theory, the court would need to interpret the terms of Northern Valley's tariff number three. But, as stated above, interpretation of the tariff's terms requires the FCC's technical expertise. Thus, as in the other cases,[7] the court will refer an issue about rate making to the FCC: In the event that the services provided by Northern Valley to Sprint do not qualify as switched access services under Northern Valley's interstate tariff number three or interstate revised tariff number three, but Northern Valley is otherwise entitled to compensation for these services, then what is a reasonable rate for these services.

## II.   Sprint's Additional Proposed Issues

In addition to the three issues outlined above, Sprint requests two other issues be referred to the FCC. First, Sprint requests that the court refer the issue of "what the requirement that an end user pay for a telecommunications

---

[7] *Sancom*, 696 F. Supp. 2d at 1043 ("In the event that the services provided by Sancom to AT & T, by which calls placed by AT & T's customers are delivered to free calling providers served by Sancom, do not qualify as switched access service under Sancom's applicable interstate access tariff, determination of the proper classification of these services, whether such services are subject to federal tariffing requirements, and whether Sancom is entitled to obtain compensation for these services.")

service actually means." Docket 59 at 10. The FCC has reasoned that an important factor in determining if a conference calling company is an end user is whether the conference calling company paid for the CLEC's or LEC's services. *See, e.g.*, *Farmers II,* 24 FCC Rcd. at 14805 n.45 (reasoning that conference calling companies were not end users because the companies did not subscribe to the LEC's local service or access tariffs and the companies did not pay for any of the LEC's local exchange offerings (citation omitted)); *see also Qwest v. Northern Valley I,* FCC Rcd. at 8337-38 ("[I]n order to be a telecommunications service, the service provider must assess a fee for its service." (quotation omitted)).

Northern Valley's tariff number three did not require end users to pay a fee until the FCC invalidated that language on June 7, 2011. The parties dispute whether Northern Valley's revised tariff number three requires end users to pay for services offered by Northern Valley. *See* Docket 36 at 13-15; Docket 43 at 8-10. The FCC will need to interpret revised tariff number three to determine whether the tariff requires an end user to pay for Northern Valley's services.

Sprint further disputes whether any payments made by conference calling companies to Northern Valley were legitimate payments. *See* Docket 59 at 10. Sprint requests that the court refer the issue of what payment means to the FCC: "[W]hat the requirement that an end user pay for a

24

telecommunications service actually means." Docket 59 at 10. Thus, the court will refer the following issue to the FCC: Do the pre-November 29, 2011, payments by the conference calling companies constitute payments under Northern Valley's revised tariff number three?

Sprint's second issue for referral concerns tariff number three's definition of "service." Sprint argues that, given Northern Valley's definition of "customer" and "buyer," Docket 36 at 20-21, Northern Valley does not provide a "service" to Sprint. Northern Valley disputes this. Docket 43 at 21-23. Sprint asserts that this issue exists in all versions of tariff number three. Docket 59 at 10. Thus, the court will refer the following issue to the FCC: Whether Northern Valley can collect access service charges from Sprint under all versions of its tariff number three because of the tariff's definitions for "customer," "buyer," and "service."

## III.   Request to Delay Referral

In the event that the court stays and refers this case, Northern Valley requests that the court delay the referral until the parties conclude the discovery process that they started before the SDPUC, which Northern Valley asserts is almost complete.[8] Northern Valley contends that the FCC prefers

---

[8] "Sprint has completed its depositions of Northern Valley's witnesses and deposed the relevant conference call providers. Northern Valley continues to seek discovery from Sprint in preparation for taking the depositions of Sprint's witnesses. A hearing in the proceeding may occur in or about August 2012." Docket 58 at 8.

25

cases in which discovery has been completed: "In light of this, it seems unlikely that the Commission would devote significant resources to resolving a referral in this case until and unless discovery has been completed." Docket 58 at 14.

The court does not consider the regulatory agency's discovery rules and pleading requirements in applying the primary jurisdiction doctrine. *See Access Telecomms.*, 137 F.3d at 608 (explaining that the primary jurisdiction doctrine should be applied when the issue calls for expert consideration and uniformity within the field of regulation). "[I]f . . . the primary jurisdiction doctrine applies on any set of facts that could be developed by the parties, there is no reason to await discovery, summary judgment, or trial, and the application of the doctrine properly may be determined on the pleadings." *Davel Commc'ns, Inc. v. Qwest Corp.*, 460 F.3d 1075, 1089 (9th Cir. 2006).

Northern Valley cites no FCC precedent stating that the FCC requires parties to have completed discovery before addressing issues in a referred case. Instead, Northern Valley states that the FCC chose a certain case, *Sancom v. Qwest*, as the lead referral in an earlier set of referred cases, which included *Sprint I*, because discovery was complete in that case. The fact that the FCC "designated the case in which discovery was complete as the lead case does not suggest that completed discovery was necessary for the FCC to proceed." *Splitrock*, 2010 WL 2867126, at *12. "Indeed, the FCC did not require that the case in which discovery was complete be designated as the lead case, but

26

rather ordered the IXCs to 'decide amongst themselves which IXC [would] be the complainant in the proceeding.' " *Id.* (citing Letter by Deputy Chief, Market Disputes Resolution Division, Enforcement Bureau, Docket 80-1 at 3 (released May 5, 2010); Letter by Deputy Chief, Market Disputes Resolution Division, Enforcement Bureau, Docket 80-1 at 6 (June 2, 2010) (noting that IXCs indicated that they had agreed that Qwest would file the formal complaint)). The court will not delay referral to the FCC to allow the parties to complete discovery because discovery is almost complete (and can be completed under the FCC's discovery rules) and because the primary jurisdiction doctrine does not require discovery to be complete before a case is referred.

## CONCLUSION

Pending before the court is Northern Valley's motion for summary judgment. Before the court addressed the summary judgment motion, it ordered the parties to brief whether this case should be stayed and certain issues referred to the FCC for resolution. Sprint argues that this case should be stayed and referred to the FCC. Northern Valley contends that the court should rule on the pending summary judgment motion and not refer this case to the FCC unless it needs assistance in crafting a remedy, or, if the court does refer this case to the FCC, to delay referral until the parties have completed discovery. Because the primary jurisdiction doctrine supports a stay and referral in this case, the court will stay and refer this case and will not delay

referral until the parties complete discovery. If Northern Valley's motion for summary judgment is still relevant after the FCC has made its final determination on referral, Northern Valley may again move for summary judgment. Accordingly, it is

ORDERED that plaintiff's motion for summary judgment (Docket 23) is denied without prejudice.

IT IS FURTHER ORDERED that this action is STAYED pending (1) resolution of the dispute by agreement of the parties; (2) a decision on the disputed issues by the FCC pursuant to the referral described below; or (3) further order of the court.

IT IS FURTHER ORDERED that this matter is referred to the FCC for resolution, to the extent the FCC's jurisdiction permits, of the following issues:

(1)     Whether, under the facts of the present dispute between Northern Valley and Sprint, Northern Valley is entitled to collect interstate switched access charges that it has billed to Sprint, including services that may utilize VoIP technology, pursuant to Northern Valley's interstate access tariff number three or revised interstate access tariff number three for calls to numbers assigned to free calling providers.

(2)     If the services provided by Northern Valley do not qualify as switched access services to companies that provide free conference calling services, then determination of how the traffic should be classified, whether that traffic can be tariffed, and whether Northern Valley is entitled to any compensation for the services Northern Valley provided, and if so, what a reasonable rate would be for Northern Valley's services.

28

(3)    In the event that the services provided by Northern Valley to Sprint do not qualify as switched access services under Northern Valley's interstate tariff number three or interstate revised tariff number three, but Northern Valley is otherwise entitled to compensation for these services, then what is a reasonable rate for these services.

(4)    Do the pre-November 21, 2011, payments by the conference calling companies constitute payments under Northern Valley's revised tariff number three?

(5)    Whether Northern Valley can collect access service charges from Sprint under all versions of its tariff number three because of the tariff's definitions for "customer," "buyer," and "service."

IT IS FURTHER ORDERED that Sprint will contact the Market Disputes Resolution Division of the FCC to obtain guidance regarding the appropriate method for bringing this matter before the FCC. Sprint will initiate proceedings as recommended by the Market Disputes Resolution Division within 30 days of the date of this order. Sprint is directed to furnish the FCC with a copy of this order as part of its submission.

IT IS FURTHER ORDERED that the parties will submit a joint report to the court every three months describing the status of the proceeding before the FCC, the first of which will be filed no later than three months from the date of this order.

Dated March 23,  2012.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE

29